# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

UNITED STATES OF AMERICA

     Plaintiff,

v.                                    Case No. 09-CR-20191

LARRY MELL McCREARY,

     Defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANT'S "MOTION FOR NEW TRIAL AND/OR JUDGMENT NOTWITHSTANDING THE VERDICT . . ." AND DENYING DEFENDANT'S "MOTION TO SUPPLEMENT RECORD FOR NEW TRIAL AND/OR JUDGMENT NOTWITHSTANDING THE VERDICT"

Pending before the court is Defendant's "Motion for New Trial and/or Judgment Notwithstanding the Verdict or Alternatively to Revisit the Motion to Suppress Evidence," filed on December 9, 2009, and Defendant's "Motion to Supplement Record for New Trial and/or Judgment Notwithstanding the Verdict,"[1] filed on December 14, 2009. A hearing on these motions is unnecessary. *See* E.D. Mich. LR 7.1(e)(2). For the reasons stated below, the court will deny Defendant's motions.

## I. BACKGROUND

Defendant Larry Mell McCreary was convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), on December 1, 2009. The conviction arises in the wake of a search warrant execution by the Detroit Police Department at

---

[1]Defendant entitles this motion as a "Supplement to Motion for New Trial and/or Judgment Notwithstanding the Verdict," but the motion was docketed as a "Motion to Supplement Record for New Trial . . . ." The motion is actually a renewed Rule 29 motion for judgment of acquittal that was made at the close of the Government's case.

5621 Rogers on April 2, 2009.  During the execution of the search warrant, the police found a firearm, which serves as the basis for the Defendant's conviction.

In the early afternoon of April 2, 2009, Detroit police officers, in tandem with U.S. Immigration and Customs Enforcement ("ICE") agents, were conducting surveillance of 5621 Rogers, a small two bedroom house in Southwest Detroit.  They were looking for a person with the street name "Milkbone," who was alleged to have shot an off-duty police officer in Windsor, Ontario.

While conducting surveillance, the officers observed the very odd spectacle of people walking up to the side of the house near what looked like a vent below a window (it turned out to a round metal dryer vent protruding through the wall of the house), stand there for a minute or two conducting what appeared to be a narcotics transaction, and then walk away.  The officers stopped two of the individuals, finding marijuana on the first person they stopped.

After making these observations, Officer Adrian Lawrence left the scene to obtain a search warrant while the other officers stayed behind and continued observation of 5621 Rogers.  In the search warrant affidavit, Officer Lawrence first described his qualifications, training, and experience.  He then described the events that had occurred earlier in the day:

> On April 2, 2009, affiant set up fixed surveillance at 5621 Rogers, while at the location affiant observed a Mexican male walk up to the side of the location on the alley side of the dwelling and reach through a vent and place what appeared to be money and then grab a small item out of the vent and walk away.  Affiant then observed a black female walk to the same side of the dwelling and observed the same transaction.  While continuing fixed surveillance affiant observed a white female conduct the same [transaction] as the other persons.  The white female (name and dob given upon request), who was stopped and questioned [about] the

2

> nature of being a[t] 5621 Rogers and stated that they were out of cocaine
> but have heroin and marijuana. Based on affiant's experience in drug
> trafficking and sale affiant believes drugs are being sold at this location.
> Affiant also found that this location at 5621 Rogers has a narcotics
> complaint# A09-386.

(Search Warrant Aff., Gov't's Resp. to Def.'s Mot. to Suppress, Ex. 1.) The affidavit

concluded with Officer Lawrence's conclusion that there was probable cause to find

narcotics at the address. Based on this affidavit, a Wayne County magistrate issued a

search warrant in order to seize narcotics and related materials.

The search warrant was executed the same day. Upon executing the warrant,

the officers announced that it was the police and attempted to gain access to the house

by using a "ram" to knock open the front door. (Trial Tr. at 22-24.) The "ram," however,

was no match for the barricaded door, and the officers could not gain immediate access

to the house. (*Id.*) After a delay the officers characterized as dangerously

uncomfortable during which repeated attempts –by two officers in succession– to knock

the door open with a ram proved unsuccessful, Defendant opened the front door and

admitted the search team.

Inside the house, the officers soon observed why they could not get in. The front

door to the house was equipped with a "drop," which is a bracing mechanism built with

two by four lumber. Such drops are often used by drug dealers to prevent the police

and rival drug dealers from gaining entry into a house. (*Id.* at 27.) The officers secured

Defendant and searched the house. In the kitchen, they found a small digital scale and

plastic baggies, both of which are indicative of narcotics trafficking. In the bathroom,

next to the kitchen, the officers located the hole through which they had previously

observed what appeared to be narcotics transactions conducted from outside the house

to the inside.  The hole was inside a very small closet and was similar to a clothes dryer vent, but the closet was not large enough to contain a dryer.  There was water on the floor surrounding the toilet.  In one of the bedrooms in the house, officers seized a loaded twelve gauge shotgun and a box of ammunition for a .357 caliber firearm.  The shotgun, equipped with an epoxy pistol grip, was of a design used typically for protection in drug houses, according to the officers' experience.

From the beginning of the surveillance to the time the search warrant was executed, officers did not observe any person enter or leave the house, and it became clear that Defendant had been the only person inside.  Defendant was subsequently arrested.  As the officers were putting him in the police car, Defendant asked an officer if he could retrieve his coat from his bedroom.  The officers then accompanied Defendant while he retrieved his coat from the northwest bedroom, the same bedroom in which the loaded shotgun had been found standing against the wall in the corner beside the door to the living room.

On May 5, 2009, Defendant was indicted on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  On July 13, 2009, Defendant filed a motion to suppress, arguing that the search warrant affidavit did not support a finding of probable cause.  The court assumed without deciding that there was no probable cause and denied the motion based on the *Leon* good-faith exception to the exclusionary rule.  (9/16/09 Order at 8.)

Defendant's trial began on November 23, 2009.  At the close of the Government's evidence, Defendant moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.  The court denied the motion, reasoning that

when viewing the evidence in the light most favorable to the Government, the jury could conclude, without any serious difficulty, that Defendant constructively possessed the firearm found in the bedroom. (Trial Tr. at 386-87.) Defendant was subsequently convicted, and thereafter filed the present motions for new trial or judgment notwithstanding the verdict.

## II. STANDARD

### A. Motion for New Trial

Federal Rule of Criminal Procedure 33, which governs motions for new trials, provides that:

> (a) Defendant's Motion. Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. . . .
>
> (b) Time to File.
>
>> (1) Newly Discovered Evidence. Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.
>>
>> (2) Other Grounds. Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty.

Fed. R. Crim. P. 33. "The defendant bears the burden of showing that a new trial ought to be granted." *United States v. Seago*, 930 F.2d 482, 488 (6th Cir. 1991). "The decision to grant or deny a motion for new trial rests within the district court's sound discretion." *Id.*

### B. Motion for Judgment of Acquittal

The court may enter a judgment of acquittal if the evidence presented at trial is insufficient to support a conviction. Fed. R. Crim. P. 29. "In reviewing challenges

regarding the sufficiency of the evidence presented to the jury, [the court is] limited to ascertaining whether, viewing the evidence in the light most favorable to the government, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Carmichael*, 232 F.3d 510, 519 (6th Cir. 2000) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original). A court must therefore "draw all available inferences in favor of the jury's verdict." *United States v. Maliszewski*, 161 F.3d 992, 1006 (6th Cir. 1998) (citing *United States v. Smith*, 39 F.3d 119, 121 (6th Cir. 1994)). Moreover, "'[s]ubstantial and competent' circumstantial evidence by itself may support a verdict and need not 'remove every reasonable hypothesis except that of guilt.'" *United States v. Lee*, 359 F.3d 412, 418 (6th Cir. 2004) (quoting *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984)). Thus, "[a] defendant bringing such a challenge bears a 'very heavy burden.'" *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003) (quoting *United States v. Vannerson,* 786 F.2d 221, 225 (6th Cir. 1986)).

### III. DISCUSSION

Defendant now argues that the "officers' trial testimony establishes by more than a preponderance of the evidence that there are false statements in the search warrant." (Def.'s Mot. ¶ 8.) Specifically, Defendant argues that the portion of the affidavit describing the observations at the side of the house is false. (*Id.* ¶ 7.) The Government contends that Defendant's argument is untimely and that Defendant has not demonstrated that the statements in the affidavit were false. (Gov't Resp. at 2, 8.)

In Defendant's supplemental motion, he argues that the evidence presented at trial was insufficient to establish his guilt. (Def.'s Suppl. Mot. ¶ 3.) The Government

6

argues that the evidence at trial was sufficient to establish that Defendant knowingly possessed the firearm.  (Gov't's Resp. at 7.)

## A. Search Warrant Affidavit

### 1. Waiver

The Government argues that Defendant waived his argument regarding any alleged falsity in the search warrant affidavit by failing to file a timely motion to suppress under Federal Rule of Criminal Procedure 12(b)(3).  (Gov't's Resp. at 2.)  The Government contends that Defendant has not established "good cause" for this failure, as required by Rule 12(e), and that Defendant cannot avoid the requirements of Rule 12 by casting a suppression motion as a Rule 33 motion for new trial or a Rule 29 motion for judgment of acquittal.  (*Id.* at 3-5.)  Defendant argues that "there is good cause for the delay in raising the issue, since the facts supporting this claim were not revealed until the trial."  (Def.'s Reply at 2.)

Under Federal Rule of Criminal Procedure 12(b)(3)(C), a motion to suppress must be raised before trial.  If the motion to suppress is not raised by the deadline set by the court, then it is waived.  Fed. R. Crim. P. 12(e); *see United States v. Pope*, 467 F.3d 912, 919 (5th Cir. 2006) (explaining that one of the reasons for this rule is that "[i]f, at trial, the government assumes that a defendant will not seek to suppress certain evidence, the government may justifiably conclude that it need not introduce the quality or quantity of evidence needed otherwise to prevail" (citation omitted)).   "For good cause, the court may grant relief from the waiver."  Fed. R. Crim. P. 12(e).  Courts have reached different conclusions on the issue of waiver when a defendant raises a post-trial argument that the search warrant affidavit was false based on the testimony

presented at trial.  *Compare United States v. Wake*, 948 F.2d 1422, 1427 (5th Cir. 1991) (noting that because the defendant "raised his argument only in motions for acquittal and a new trial, the scope of our review is limited" and then denying the motions because defendant did not prove that the affiant "acted with deliberate falsehood or reckless disregard for the truth"), *and United States v. Bulgatz*, 693 F.2d 728, 731 n.7 (8th Cir. 1982) (stating that "because the critical prerequisite for finding a waiver of the right to challenge a search warrant requires that counsel failed to exercise a known right, and the appellant could not raise the issue until the truth came out at trial, we find no waiver" (citation omitted)), *with United States v. Dukes*, No. 93-8851, 1994 WL 499683, at *2 (5th Cir. Aug. 23, 1994) (per curiam) (finding that the defendant "waived the issue of the veracity of the warrant affidavit" —an issue based on a confidential informant's testimony at trial— because he "did not allude to any issue regarding the warrant affidavit in his pretrial motion to suppress").

Here, the court concludes that Defendant waived his right to challenge the veracity of the observations in the search warrant affidavit.  Although Defendant may not have known exactly what the officers could see from their vantage points outside the house, the trial testimony demonstrated that he certainly knew what was going on at the vent.  The three individuals, one after another, interacted with someone on the inside of the house.  The problem Defendant alleges with the affidavit is predicated on the proposition that the affiant's statement —that officers saw what appeared to be a transaction through the vent— was untrue.  If the truth were that no money was exchanged, or if it were the case that no small items had been passed through the vent by someone inside to someone standing outside, Defendant would have known this

8

before trial because Defendant was the only person inside. Defendant was properly positioned, therefore, to have timely contested the veracity of the search warrant affidavit in a suppression motion before trial. *See, e.g.*, *United States v. Hudson*, 325 F. App'x 423, 425 (6th Cir. 2009) (defendant's motion for *Franks* hearing supported by defendant's affidavit that "he was alone at his residence, that he never sold marijuana and cocaine there between February 20 and 28, 2006, and that detectives did not in fact find cocaine or marijuana during their search.").

This is not to say that a defendant is *never* able to show good cause to contest the truthfulness of a search warrant affidavit based on an officer's testimony at trial. But the more apt case would be when an officer's alleged false statements do not directly implicate a defendant's actions, such as if an officer admits at trial that he fabricated, or was recklessly indifferent to the veracity of, a portion of the search warrant affidavit about his prior dealings with a confidential informant included in the search warrant affidavit to show that the informant was reliable. In a situation such as that, a defendant may have had no other means of discovering the false statement until trial and therefore may be able to demonstrate good cause for the delay.

In this case, however, the officer's observations directly implicated Defendant, who is presumed to have had personal knowledge of the events described in the affidavit and who could have timely brought a suppression motion before trial if he believed the officers had materially lied. Accordingly, Defendant has not shown "good cause" for his failure to file a timely suppression motion.

Morever, the rationale behind Rule 12(e) supports finding a waiver. *See Pope*, 467 F.3d at 918-19. The Government was never put on notice that Defendant was

challenging the truthfulness of Officer Lawrence's observations in the search warrant affidavit. The Government therefore had no reason to reinforce his testimony in this regard. Although all of the officers were asked repeatedly about their observations at the side of the house, no officer was confronted with an allegedly false statement in the search warrant affidavit. It would be unfair to allow Defendant to raise this argument post-trial, when the Government no longer has an opportunity to further develop or to clarify the officers' testimony.

Defendant argues that he did contest the veracity of the search warrant affidavit. (Def.'s Reply at 2.) In his reply to the Government's response to his motion to suppress, Defendant noted that the affiant stated that he had the "name and dob" of the third individual who approached the house when in fact he only had her name and age. However, even when a party brings a pretrial suppression motion, arguments raised for the first time after the deadline are deemed waived under Rule 12(e). *Cf. Pope*, 467 F.3d at 918-19; *United States v. Lopez-Medina*, 461 F.3d 724, 738 (6th Cir. 2006). Defendant's argument that the officer's observations at the side of the house were false is an argument not raised before the court's deadline. Accordingly, it was waived.

Alternatively, even assuming that Defendant could not have discovered the facts to raise this claim before trial, he still is not entitled to relief because, as discussed below, he has not demonstrated that the statements in the search warrant affidavit were made knowing that they were false or with a reckless disregard for the truth.

### 2. Alleged Falsity of Search Warrant Affidavit

Defendant argues that "[t]he officer's testimony makes clear that there is an incorrect statement in the search warrant affidavit" and that "[i]n light of the officer's

testimony there can only be one conclusion: The search warrant contains false statements that are either deliberately false or recklessly disregarded." (Def.'s Mot. ¶ 10; Def.'s Mot. Br. at 6.) Specifically, Defendant asserts that "[n]ot one of the officers testified that they saw any of the[] persons 'reach through a vent and place what appeared to [be] money and then grab a small item out'" and "[n]ot one of the officers even testified to seeing any exchange through the vent." (Def.'s Mot. ¶ 7.) Instead, Defendant asserts that the officers merely testified to seeing people "pointing toward," "bending over," or "say[ing] something" by the vent. (*Id.*) Although Defendant initially requests a *Franks* hearing, he later argues that a *Franks* hearing is not necessary. (*Id.* ¶ 10; Def.'s Mot. Br. at 7.) The Government argues that "Defendant has not made [a] substantial showing of deliberate or recklessly false statements" in the search warrant affidavit. (Gov't's Resp. at 8.)

In *Franks v. Delaware*, 428 U.S. 154 (1978), the Supreme Court held that,

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

428 U.S. at 155-56.

Here, the court did not find that the warrant was supported by probable cause. (9/16/09 Order at 8.) Instead, the court denied Defendant's motion to suppress based on the *Leon* good-faith exception to the exclusionary rule. (*Id.*) Under *Leon*, even if a reviewing court concludes that a warrant lacked probable cause, courts should not suppress "evidence obtained in objectively reasonable reliance on a subsequently

invalidated search warrant." *United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004) (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)). The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Higgins*, 557 F.3d 381, 391 (6th Cir. 2009) (quoting *Leon*, 468 U.S. at 922-23 n.23). The good-faith exception will not apply, however, "where the affidavit contains information the affiant knows or should have known to be false." *United States v. Washington*, 380 F.3d 236, 241 (6th Cir. 2004).

Defendant has not demonstrated that the information in the search warrant affidavit was false. Officer Lawrence's testimony at trial is not of necessity inconsistent with the affidavit. He testified that the first person walked to the back corner of the house and stood facing the house. (Trial Tr. at 179-80.) He testified that he "could see his arm reach, like he was pointing at something. He stayed there for maybe two minutes, two and a half minutes." (*Id.* at 180.) Based on his training and experience, he testified that he believed that this person was buying narcotics. (*Id.*) When asked what factors contributed to this conclusion, Officer Lawrence responded, "The shorter period of time that he was there, if, I mean, he couldn't have been breaking in the place because he wasn't climbing, he wasn't pushing. He is standing there and he was pointing at something, and *he reached for something.*" (*Id.* (emphasis added).) He agreed that it was unusual for a person to go to a back corner hole of a house "unless you're doing that activity, buying narcotics. There's no doors, there's no entrance way to get in the house." (*Id.*) Defense counsel cross-examined Officer Lawrence on these same events:

12

Q.      And did you -- you said you saw pointing?

A.      Yes.

Q.      Tapping on a window?

A.      No.  Later, if I can tell you, we found out what, what

        they were pushing.

Q.      I asked if, did you see him tapping on the window at

        all?

A.      No.  The window would be too high.

Q.      Now, when you -- then you, so you see this person go up pointing,

        you said you saw the person take something away?

A.      I couldn't see what he had in his hand, but like he was reaching for

        something.

Q.      You saw --

A.      Yes.

Q.      You didn't see anything in his hand?

A.      No.

Q.      You didn't see anything in his hand while he was reaching, you

        didn't see him take anything back?

A.      No.  I just saw him extend his arm towards the house.

(*Id.* at 209.)

    After cross-examination, the court asked a question posed by a juror: why were

charges not filed against the three people that the officers observed approaching and

leaving the house?  (*Id.* at 277-78.)   Officer Lawrence responded, "Well, it's not

uncommon for us not to do that with the people in the transaction because, basically, we don't want to jeopardize our surveillance." (*Id.* at 278.) On recross-examination, Officer Lawrence was again questioned regarding his observations of the three individuals walking up to the hole on the side of the house:

Q.  You didn't see transactions with these three people?

A.  Well --

Q.  That went up to the side of the house?

A.  What I believe was a transaction, yes.

Q.  You didn't see a hand-to-hand?  You didn't see an exchange made?

A.  No.  I couldn't see that part, no.

Q.  You didn't see them walking away with drugs in their hands?

A.  No.  I couldn't see from that far.

(*Id.* at 284.)

This testimony is not necessarily inconsistent with observations recorded in the affidavit, in which he said that he observed a Mexican male walk up to "the alley side of the dwelling and reach through a vent and place what appeared to be money and then grab a small item out of the vent and walk away."  (Search Warrant Aff., Gov't's Resp. to Def.'s Mot. to Suppress, Ex. 1.)

Although Lawrence's in court testimony was that he did not see "drugs" in the person's hand and that he did not see a "hand-to-hand" exchange or the person take anything out of the vent, he also testified that he saw the individual *reach for something* while standing at the side of the house, conducting what appeared to him to be a

14

transaction. He did not testify that the person merely pointed at the house. Although the person acted "*like* he was pointing at something," the person was also reaching out to the house: "I just saw him extend his arm towards the house." (Trial Tr. at 180, 209.)

The "something" for which the person standing at the side of a house for a short period of time "reached," given the small size of the vent opening, would itself have been small. Moreover, the affidavit states only that the officer observed the individual place what "appeared" to be money. What "appears" to be the case is always based upon the circumstances known to the observer, and the reality is that appearances can be deceiving. Something in this context could "appear" to be money based upon background circumstances rather than physical characteristics of the thing itself.

In addition, the testimony of the other officers is consistent with the search warrant affidavit. Sergeant Manuel Gutierrez testified, "I saw the white female again, at the side of the house, as if she was talking to somebody through the house." (*Id.* at 17.) Based on his training and experience, he testified that "[i]t appeared it was indicative of some kind of narcotics transaction." (*Id.*) He later testified that the person "was doing something on the side of the house," and the person obviously "wasn't talking to the wall," although he did not see anything in particular exchanged. (*Id.* at 50, 53, 88-89, 106.) Officer Lillie Drake testified, "I observed, myself, I observed an individual walk up to the rear of the location and bend over to the side of the house and just bend over, and I saw a hand motion of that individual." (*Id.* at 303-04.) Officer Darryl Chappell testified, "I observed, while we were sitting there, I observed three narcotic transactions . . . suspected narcotic transactions." (*Id.* at 361-62.) Specifically, he testified, "The first individual I observed was a Hispanic male, about six feet, walk . . . down Rogers to the

alley, to the side of the Rogers location, at which time he stopped.  His hand motioned up toward the side of the house, and he leaned over and said something into the, what looked like a dryer vent." (*Id.* at 362.)  This testimony supports the conclusion that the search warrant affidavit did not contain false statements.

Lawrence was not confronted at trial with an allegedly inconsistent and falsely incriminating statement in the affidavit, and asked to explain it.  He gave no testimony contradictory to the affidavit.  Defendant's point fails.  Had Defendant cross examined more precisely on this question, it is conceivable that a basis may have been established.  For instance, Lawrence could have been asked, "you say now that these people were only pointing at the house, but earlier you said they actually appeared to be handing over money in exchange for drugs.  How can these statements both be true?"

The court is reasonably confident that Lawrence could have explained what he meant in the affidavit by seeing someone "reach through a vent and place what appeared to be money and then grab a small item out of the vent."  However, if there were no good explanation, it could be fair to say that "[t]he officer's testimony makes *clear* that there is an incorrect statement in the search warrant affidavit."  (Def.'s Mot. ¶ 10 (emphasis added).)  Because this did not happen, however, there is no basis to say that the trial testimony "puts the lie to" the affidavit statements.  An absence of sufficiently pointed questioning at trial can, and in this case does, explain an affiant failing to mention or clarify various allegedly inconsistent facts.  The court knows of no rule requiring that everything in a search warrant affidavit must be recited through testimony at trial.  The absence of testimony at trial that replicates the manner in which statements were made in the affidavit does not equate to proof of the affidavit's falsity.

Moreover, even if Officer Lawrence had testified at trial very clearly inconsistently with the affidavit, it cannot be said that any one thing in either the affidavit or in the testimony is "false." The most that can be concluded is some degree of inconsistency. A statement made under oath at trial (which the Rules of Evidence require to be responsive to and limited by the question asked) is not necessarily more reliable or more "true" than an allegedly different statement also made under oath in the search warrant application process conducted months earlier.

Nevertheless, even if the cited information in the search warrant were false, Defendant has not demonstrated that the affiant knew it was false or that it was included in the affidavit with a reckless disregard for the truth. The minor discrepancies between the trial testimony and the affidavit, if indeed they are actual discrepancies, are simply insufficient to make this showing. "Minor discrepancies in the affidavit may reflect mere inadvertence or negligence, rather than the reckless falsehood that is required for exclusion." *United States v. Elkins*, 300 F.3d 638, 649 (6th Cir. 2002) (citing *United States v. Searcy*, 181 F.3d 975, 980 (8th Cir. 1999)). "Warrant language may fall short of technical exactitude without necessarily violating the materiality and scienter requirements of *Franks*." *Id.* (finding no "reckless or intentional falsehood" when the affidavit incorrectly stated that one building was behind another building and that the defendant owned the building when he was really a tenant); *see also United States v. Sawyers*, 127 F. App'x 174, 181-86 (6th Cir. 2005) (finding that mistakenly using the name "Tyrone" instead of "Jerome" in the affidavit and omitting certain facts in the affidavit did not demonstrate a "reckless disregard for the truth"); *United States v. Mick*, 263 F.3d 553, 562-64 (6th Cir. 2001) (finding that the five misstatements in the affidavit

17

did "not rise to the level of deliberate or reckless misstatements as required by *Franks*").

Similarly, the Supreme Court has stated that its prior decisions:

> reflect the recognition that the Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

*United States v. Ventresca*, 380 U.S. 102, 108 (1965).

Here, Defendant has not presented any evidence that the officer's descriptions of and conclusions concerning what he observed at the side of the house constituted an intentional or reckless falsehood. He merely argues that because the trial testimony "contradicts" the statements in the search warrant affidavit, "there can be no claim that the statements were not made intentionally or at least with a reckless disregard for the truth." (Def.'s Mot. ¶ 7.) However, as the Sixth Circuit cases demonstrate, simply because there is a misstatement in the search warrant affidavit, it does not necessarily follow that it was made intentionally or with a reckless disregard for the truth. *Sawyers*, 127 F. App'x at 181-86; *Elkins*, 300 F.3d at 649; *Mick*, 263 F.3d at 562-64.

The difference between the testimony at trial that a person was "reach[ing], like he was pointing at something" and "conducting what appears to be a narcotics transaction," as compared to the observations in the search warrant affidavit that the person was seen placing in the vent "what appeared to be money and then grab[bing] a small item" is too insignificant to demonstrate a reckless disregard for the truth. The

18

court declines Defendant's invitation to adopt such a "grudging" view toward the affidavit in this case. *Ventresca*, 380 U.S. at 108. Defendant has not shown that the affidavit contains an intentional or reckless falsehood, and Defendant is not entitled to a new trial or a judgment of acquittal.

## B. Sufficiency of the Evidence

In Defendant's renewed Rule 29 motion, he argues that the Government's proof failed to establish that he constructively possessed the firearm found at 5621 Rogers. (Def.'s Suppl. Mot. ¶ 3.) The Government argues that the "evidence is sufficient to show that Defendant knowingly possessed the firearm." (Gov't's Resp. at 7.)[2]

To prove possession, the Government must establish either "actual possession" or "constructive possession." *United States v. Russell*, --- F.3d ----, 2010 WL 565317, at *9 (6th Cir. Feb. 19, 2010). "To establish constructive possession, the evidence must indicate ownership, dominion, or control over the contraband itself or the premises or vehicle in which the contraband is concealed." *Id.* (quoting *United States v. White*, 932 F.2d 588, 589 (6th Cir. 1991) (internal quotation marks omitted). Constructive possession can be established by direct or circumstantial evidence. *United States v. Bailey*, 553 F.3d 940 (6th Cir. 2009).

Defendant argues that the Government "did not establish that [he] had control of the premises beyond his mere presence in the home." (Def.'s Suppl. Mot. ¶ 4.)

---

[2]The Government also argues that Defendant's renewed Rule 29 motion is untimely because it was not made within seven days after a guilty verdict. (Gov't Resp. at 7.) The Government, however, is relying on the superseded version of Rule 29. This rule was amended effective December 1, 2009, to extend the time to file a motion until "14 days after a guilty verdict." Fed. R. Crim. P. 29(c)(1). Defendant's motion was filed within ten days of the guilty verdict and is therefore timely.

"'Presence *alone*' near a gun, true enough, does not 'show the requisite knowledge, power, or intention to exercise control over' the gun to prove constructive possession." *United States v. Arnold*, 486 F.3d 177, 183 (6th Cir. 2007) (en banc) (quoting *United States v. Birmley*, 529 F.2d 103, 107-08 (6th Cir. 1976)) (emphasis in original). But as in *Arnold*, "that is not what we have here." *Id.* Here, there is "other incriminating evidence, coupled with presence" that tips the scale in favor of a finding of sufficiency. *Id.* (quoting *Birmley*, 529 F.2d at 108).

After his arrest, Defendant told Sergeant Gutierrez that his coat was in "his bedroom." (Trial Tr. at 35.) Sergeant Gutierrez and Officer Chavez then accompanied Defendant as he retrieved his coat from the bedroom in which the relatively large gun had been found in plain view, leaning up against the wall. Although Defendant presented testimony that he did not live in this house and was merely staying there with his fiancé, the jury was free to credit the officer's testimony that Defendant had said it was "his bedroom." (*Id.*) The Government also presented substantial evidence that Defendant was engaged in narcotics trafficking, which is evidence of a motive to possess a firearm. *See, e.g.*, *United States v. Frederick*, 406 F.3d 754, 761 (6th Cir. 2005) ("Courts have held that evidence of drug dealing is admissible to show a motive to possess firearms illegally."); *United States v. White*, 356 F.3d 865, 870 (8th Cir. 2003) ("Our court recognizes the known correlation between drug dealing and weapons, and accepts that they are closely and integrally related to the issue of possession of a firearm."). The jury couuld conclude that the three individuals who were observed walking up to the dryer vent on the side of the house were indeed conducting narcotics transactions. The jury could conclude that, during this time, Defendant was the only

person inside the house. The jury heard descriptions and saw photographs of the barricade mechanism which confronted the officers when they tried unsuccessfully to gain entrance. The jury could conclude that such a barricade is a common feature in drug houses. Inside the house, officers recovered digital scales and plastic baggies, and both could be seen as indicative of drug dealing. In the bathroom, there was water in the vicinity of the toilet, as if contraband had been hurriedly flushed. In addition, the gun recovered was not a typical shotgun that might be possessed by an ordinary citizen or a legitimate hunter. Instead, it was a substantially customized firearm commonly used for protection in drug houses, with a "home-made" epoxy pistol grip added. This evidence, taken together, was easily sufficient for a reasonable jury to find beyond a reasonable doubt that Defendant exercised "ownership, dominion, or control" over the house, the bedroom, and the readily-accessible firearm standing just inside.

In support of his motion, Defendant relies on *Bailey*, in which a jury convicted the defendant of being a felon in possession of a firearm after police found a loaded handgun under the seat of the stolen car that he was driving. 553 F.3d at 942-46. In an earlier opinion, the Sixth Circuit found that the evidence was sufficient to support the conviction based, in part, on the passenger's statement that she had seen the defendant place the gun under the seat. *United States v. Bailey*, 510 F.3d 562, 568 (6th Cir. 2007). Upon rehearing, the Sixth Circuit vacated parts of the earlier panel decision because the trial court had admitted the passenger's statement for impeachment purposes only and not as substantive evidence of guilt. *Bailey*, 553 F.3d at 942-43. Without these statements, the Sixth Circuit concluded that the evidence was insufficient to establish constructive possession because the only evidence supporting the

conviction was the "fact that the loaded gun was found underneath [the defendant]'s seat in the stolen car he was driving and that he had attempted to evade police." *Id.* at 945. In illuminating the standard for proving specific intent under a constructive possession theory, the *Bailey* court noted the "widely held doctrine" that "'the government must present evidence to show some connection or nexus between the defendant and the firearm,' which can be established by a showing that the defendant had '*knowledge* and *access* . . . [to the] firearm.'" *Id.* (quoting *United States v. Johnson*, 478 F.3d 1204, 1209 (10th Cir. 2007)) (alteration and emphasis in original).

Defendant's reliance on *Bailey* is misplaced. Unlike the limited-purpose statement in *Bailey*, Defendant's statement that it was "his bedroom" was not limited in any way, so the jury could properly conclude from the statement, seen as substantive evidence, that Defendant presented himself as able to exercise dominion or control over the house and the bedroom. Moreover, unlike the gun in *Bailey*, which was found hidden, out of sight under the seat of a recently stolen car, the gun found at 5621 Rogers was a large shotgun found in plain view in what seemed to be the only usable bedroom in a small house. Because Defendant was the sole occupant of this small house at the time the firearm was found, a reasonable jury could conclude that Defendant knew it was there. This knowledge, coupled with his access and his motive to possess the firearm, is sufficient to establish a nexus between Defendant and the firearm.

Defendant also relies on *United States v. Beverly*, 750 F.2d 34 (6th Cir. 1984) (per curiam), which like *Bailey*, is distinguishable from this case. In *Beverly*, officers executed a search warrant and found the defendant and another person in the kitchen.

750 F.2d at 35. When the officers entered, there was a waste basket between the defendant and the other person's feet. In the container officers discovered firearms, one of which bore the defendant's fingerprint, and the defendant was charged with "receiving" the firearm in violation of 18 U.S.C. § 922(h)(1) (1982). *Id.* The government sought to prove receipt through constructive possession. *Id.*

The Sixth Circuit held that the evidence was insufficient to establish that the defendant had constructively possessed the firearm, reasoning that the evidence showed "only that [the defendant] was in the kitchen of [a third party]'s residence, that [the defendant] was standing close to a waste basket which contained two guns, and that [the defendant] had at some point touched one of the guns." *Id.* at 37.[3]

In this case, however, unlike *Beverly's* venue in someone else's kitchen, Defendant stated that it was "*his* bedroom" from which he wanted to retrieve *his* coat. *See United States v. King*, 339 F. App'x 604, 609 (6th Cir. 2009) ("This case is

---

[3] The court confesses some consternation at the Circuit panel's fact-based (and fact-bound) conclusion in *Beverly*. As noted, the panel summarized that Beverly, at the moment of the warrant execution, was standing "in the kitchen of Hatfield's residence . . . close to a waste basket which contained two guns," and acknowledged that from the fingerprint evidence, "Beverly had at some point touched one of the guns." *Beverly,* 750 F.2d at 37. The panel detailed the expert opinion evidence received showing that "Beverly's left ring finger [deposited] the print on 'the right side of the [gun] just in front of the cylinder. In other words, it [was] right over the front of the barrel . . . .' According to [State Police Crime Laboratory witness] Wood, because of the print's location, the gun 'would have had to have been laid down.' Wood demonstrated how Beverly's left ring finger would have had to have been placed on the gun. Wood also demonstrated where the print was located." *Id.* at 36. The panel, even though it purported to view all this evidence "most favorably for the government," and even though it agreed that "[t]he inferential chain used by the government to prove 'receipt' under Section 922 is sound," *id.* at 36, was still unable to locate inferential proof "sufficient" even to allow a reasonable jury to find constructive possession, *id.* at 37. The "favorable view" of the evidence expressed by the panel, in retrospect, appears perhaps somewhat less than generous.

distinguishable from *Beverly.* First, one of the witnesses at the scene testified that [the defendant] told him that the bedroom was his."). Moreover, as a social guest in another person's house, Defendant Beverly's presence near the firearm "easily lent itself to innocent explanations" because "in ordinary social relationships, a guest does not intend to exercise dominion and control over his host's personal property." *United States v. Larch*, No. 1:07-CR-0487, 2008 WL 2626810, at *6 (N.D. Ohio July 2, 2008) (distinguishing *Beverly*). Defendant's situation, by contrast, lends itself to no innocent explanations. He was barricaded alone inside a drug house, and the evidence strongly suggested that he was engaged in narcotics trafficking. The jury could conclude that he was not merely visiting a friend's house, as Defendant Beverly claimed he was, but instead was selling drugs and exercising dominion and control over the house, the bedroom, and the loaded, pistol-gripped, twelve-gauge shotgun kept at the ready within it.

Based on this evidence and viewing it in the light most favorable to the Government, a rational trier of fact could conclude that Defendant constructively possessed the shotgun.

## IV. CONCLUSION

Defendant has not demonstrated that he is entitled to a judgment of acquittal under Rule 29 or a new trial under Rule 33. Accordingly,

IT IS ORDERED that Defendant's "Motion for New Trial and/or Judgment Notwithstanding the Verdict or Alternatively to Revisit the Motion to Suppress Evidence" [Dkt. # 47] is DENIED.

IT IS FURTHER ORDERED that Defendant's "Motion to Supplement Record for

New Trial and/or Judgment Notwithstanding the Verdict" [Dkt. # 48] is DENIED.

s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

DATED: March 19, 2010

---

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail disclosed on the Notice of Electronic Filing on March 19, 2010.

s/Deborah J. Goltz
DEBORAH J. GOLTZ
Case Manager